United States Court of Appeals
Fifth Circuit

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**FILED**
June 12, 2012

Lyle W. Cayce
Clerk

No. 11-30654

U. S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
FILED
JUL 24 2012
LORETTA G. WHYTE
CLERK

D.C. Docket No. 2:10-CV-3073
D.C. Docket No. 2:10-CV-3318

In the Matter of: STEPHEN JOHN BANDI; CHARLES EDWARD BANDI,

    Debtors

---

STEPHEN JOHN BANDI,

    Appellant

v.

CHRISTOPHER BECNEL,

    Appellee

---

CHARLES EDWARD BANDI,

    Appellant

v.

CHRISTOPHER BECNEL,

    Appellee

Appeal from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

## JUDGMENT

This cause was considered on the record on appeal and the briefs on file.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that appellant pay to appellee the costs on appeal to be taxed by the Clerk of this Court.

ISSUED AS MANDATE: JUL 1 8 2012

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
Deputy

New Orleans, Louisiana     JUL 1 8 2012

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
June 12, 2012

No. 11-30654

Lyle W. Cayce
Clerk

In the Matter of: STEPHEN JOHN BANDI; CHARLES EDWARD BANDI,

Debtors.

---

STEPHEN JOHN BANDI,

Appellant,

v.

CHRISTOPHER BECNEL,

Appellee.

---

CHARLES EDWARD BANDI,

Appellant,

v.

CHRISTOPHER BECNEL,

Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

The principal question in this appeal is the proper construction of the phrase "respecting the debtor's . . . financial condition" as it appears in 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). Because we agree with the bankruptcy court's interpretation and find no clear error in that court's determination that the debtors obtained an advance of money through actual fraud, we affirm the judgment of the district court.

I

Christopher Becnel is the holder of a $150,000 promissory note executed by Charles Bandi on behalf of RSB Companies, LLC (RSB) and personally guaranteed by Charles Bandi and his brother, Stephen Bandi. When RSB defaulted, Becnel obtained separate judgments in state court against each of the Bandis based on their respective personal guarantees.

Stephen Bandi subsequently filed a voluntary Chapter 7 petition in the United States Bankruptcy Court for the Eastern District of Louisiana. Charles Bandi filed a voluntary Chapter 7 petition in the same court two months later. Becnel commenced adversary proceedings against each debtor, alleging that the debts owed to him were non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(2)(B). Section 523(a)(2)(A) provides that certain debts obtained by false pretenses, a false representation, or actual fraud are nondischargeable but excludes from its coverage "a statement respecting the debtor's . . . financial

condition."[1] Section 523(a)(2)(B) provides that certain debts obtained by a false "statement in writing . . . respecting the debtor's financial condition" are nondischargeable.[2]

The bankruptcy court consolidated the adversary proceedings for trial. Becnel alleged that both Charles and Stephen Bandi falsely represented that they owned a commercial building on North Causeway Boulevard in Metairie, Louisiana. He further alleged that Stephen Bandi falsely represented that he owned Algiers Riverpoint Condominiums in Algiers, Louisana, and that he owned a residence on Camp Street in New Orleans, Louisiana. Becnel also alleged that both Charles and Stephen Bandi presented him with a list of RSB's accounts receivable and that this list was fraudulent. Becnel asserted that the Bandis never intended to repay the loan and that Becnel would not have made the loan if he had known the accounts receivable list was falsified or that the Bandis had misrepresented their property ownership.

After a bench trial at which the Bandis cross-examined witnesses but presented no evidence, the bankruptcy court ruled in favor of Becnel, concluding that the debts were non-dischargeable. The court found that the loan of money was acquired by false pretenses, false representations, or actual fraud regarding property ownership. The bankruptcy court accordingly entered judgment against Stephen and Charles Bandi. Stephen Bandi filed a motion to alter or amend the judgment, requesting additional findings of fact, and for a new trial, specifically raising the issue of the proper interpretation of § 523(a)(2)(A) and (a)(2)(B). He noted a split among courts on the interpretation of these sections of the Bankruptcy Code and argued that throughout the case, the bankruptcy court had made contradictory rulings. He asserted that the court diverged after

---

[1] 11 U.S.C. § 523(a)(2)(A).

[2] *Id.* § 523(a)(2)(B).

trial from its last pretrial ruling, prejudicing his defense. The bankruptcy court denied Stephen Bandi's motion but commented further on its judgment. The court specifically noted that it previously had not considered Bandi's statutory interpretation argument, but Bandi had not raised it. The bankruptcy court concluded that "a statement respecting the debtor's . . . financial condition" must pertain to the overall financial condition of the debtor and that a statement about the status of specific assets was not "a statement respecting the debtor's or an insider's financial condition."[3]

The Bandis appealed to the United States District Court for the Eastern District of Louisiana. The district court affirmed. The Bandis have appealed to this court.

II

We apply the same standard of review to the bankruptcy court's decision as the district court applied.[4] The meaning of § 523(a)(2) is a question of law that we consider de novo.[5]

In a Chapter 7 bankruptcy proceeding, many of a debtor's debts are discharged.[6] However, there are a number of exceptions.[7] At issue here are the exceptions to discharge set forth in § 523(a)(2)(A) and (a)(2)(B). While the general purpose of the bankruptcy code is for debtors to obtain a "fresh start,"

---

[3] 11 U.S.C. § 523(a)(2)(A).

[4] *Wells Fargo Bank of Tex. N.A. v. Sommers (In re Amco Ins.)*, 444 F.3d 690, 694 (5th Cir. 2006) (citing *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001)).

[5] *Valley Educ. Found. v. Eldercare Props. Ltd. (In re Eldercare Props. Ltd.)*, 568 F.3d 506, 515 (5th Cir. 2009) (citing *Nesco Acceptance Corp. v. Jay (In re Jay)*, 432 F.3d 323, 325 (5th Cir. 2005)).

[6] *See* 11 U.S.C. § 727.

[7] *See id.* § 523.

4

that policy has limits, and § 523(a)(2)(A) and (a)(2)(B) are intended to protect victims of fraud.[8]

Some debts for value obtained by means of a fraudulent statement are dischargeable under § 523(a)(2), and others are not. Debt for property or other value obtained by fraud is broadly rendered nondischargeable by § 523(a)(2)(A), but that subsection carves out certain debt that follows a transfer of value or extension of credit obtained by "a statement" regarding the debtor's "financial condition" and makes that debt dischargeable.[9] However, certain other debt that follows a transfer of value or extension of credit obtained by "a statement" regarding the debtor's "financial condition" is rendered nondischargeable by § 523(a)(2)(B).[10] Under this subsection, if a statement respecting the debtor's or an insider's financial condition is in writing, materially false, reasonably relied upon by the creditor, and the debtor made the statement with intent to deceive, the debt obtained by the fraud is not discharged.

The Bandis contend that all of their alleged fraudulent statements and false representations were "statement[s] respecting [their] financial condition" within the meaning of § 523(a)(2)(A) and therefore that the debt owed to Becnel should be discharged. None of their alleged statements or representations to Becnel meet the requirements of § 523(a)(2)(B), they contend, and therefore, they argue, the debt owed to Becnel is not rendered non-dischargeable under that subsection. We must determine whether representations that one or both of the

---

[8] See Tumell & Carroll v. Quinlivan (In re Quinlivan), 434 F.3d 314, 318-19 (5th Cir. 2005).

[9] 11 U.S.C. § 523(a)(2)(A).

[10] Id. § 523(a)(2)(B).

Bandis owned particular pieces of real property constituted "statement[s] respecting [the Bandis'] financial condition."[11]

We begin our analysis with the words chosen by Congress. The word "statement" modified by the phrase "respecting the debtor's or an insider's financial condition" appears in both § 523(a)(2)(A) and (a)(2)(B).[12] The Supreme Court has described these two subsections as "two close statutory companions barring discharge," the first of which pertains to fraud "not going to financial condition" and the second of which pertains to "a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied."[13] The question before the Supreme Court in the case in which this statement was made was the level of reliance required by § 523(a)(2)(A) when actual fraud had been employed by the debtor.[14] The Court held that the applicable standard was common-law justifiable reliance rather

---

[11] *Id.* § 523(a)(2)(A).

[12] *See* 11 U.S.C. § 523(a)(2), which provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt — . . .

    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
        (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
        (B) use of a statement in writing —
            (i) that is materially false;
            (ii) respecting the debtor's or an insider's financial condition;
            (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
            (iv) that the debtor caused to be made or published with intent to deceive; . . . .

[13] *Field v. Mans*, 516 U.S. 59, 66 (1995).

[14] *Id.* at 61.

than "reasonable reliance," even though "reasonable reliance" is the standard expressly set forth in § 523(a)(2)(B).[15] But in the course of its examination of the interplay between § 523(a)(2)(A) and § 523(a)(2)(B), the Court gave at least some insight into the meaning of "a statement respecting the debtor's . . . financial condition." At one juncture, the Court equated such a statement with a statement by a debtor about his "bank balance."[16] In then explaining why Congress would choose the common-law standard of justifiable reliance for actual fraud under § 523(a)(2)(A) while expressly requiring "reasonable reliance" on written financial statements under § 523(a)(2)(B), the Court seemed to equate a "statement" about "financial condition" with what is commonly understood as something akin to a balance sheet or bank balance. The Supreme Court had considered the legislative history of § 523(a)(2)(B) regarding "the peculiar potential of financial statements to be misused not just by debtors, but by creditors who know their bankruptcy law."[17] The Court further explained,

> [t]he House Report on the Act suggests that Congress wanted to moderate the burden on individuals who submitted false financial statements, not because lies about financial condition are less blameworthy than others, but because the relative equities might be affected by practices of consumer finance companies, which sometimes have encouraged such falsity by their borrowers for the very purpose of insulating their own claims from discharge.[18]

We conclude that the phrase "a statement respecting the debtor's or an insider's financial condition" as used in § 523(a)(2) was meant to embody terms

---

[15] *Id.*

[16] *Id.* at 76 ("Does it not count against our reading of the statute that a debtor who makes a misrepresentation with the formality of a written financial statement may have less to bear [the more exacting standard of reasonable reliance found expressly in § 523(a)(2)(B)] than the debtor who commits his fraud by a statement, perhaps oral, about something other than his bank balance?").

[17] *Id.*

[18] *Id.* at 76-77.

7

commonly understood in commercial usage rather than a broadly descriptive phrase intended to capture any and all misrepresentations that pertain in some way to specific assets or liabilities of the debtor. The term "financial condition" has a readily understood meaning. It means the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities. A representation that one owns a particular residence or a particular commercial property says nothing about the overall financial condition of the person making the representation or the ability to repay debt. The property about which a representation is made could be entirely encumbered, or outstanding undisclosed liabilities of the person making the representation could be far more than the value of the property about which a representation is made.

We find support for construing "financial condition" in § 523(a)(2) to connote the overall net worth of an entity or individual in other provisions of the Bankruptcy Code. The term "financial condition" is part of the definition of the term "insolvent."[19] The words "financial condition" are used three times to define "insolvent" with respect to three classes of entities.[20] In each instance,

---

[19] 11 U.S.C. § 101(32).

[20] *Id.* This provision states:

(32) The term "insolvent" means—

(A) with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

> (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

> (ii) property that may be exempted from property of the estate under section 522 of this title;

(B) with reference to a partnership, financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation—

8

"insolvent" *is* a "financial condition."[21] In the first two instances, the financial condition of insolvency is defined by reference to debts as compared to property.[22] With respect to the third instance, which pertains to municipalities, the financial condition of insolvency is defined by reference to "generally not paying its debts as they become due" or "unable to pay its debts as they become due."[23]

The Tenth Circuit similarly looked to the definition of "insolvent" in 11 U.S.C. § 101(32) and that definition's use of "financial condition" in construing § 523(a)(2)(A) and (B).[24] That court concluded that the use of "financial condition" in the definition of "insolvent" "suggests that the term 'financial condition' in § 523(a)(2)(A) and (B) also relates to a debtor's net worth or overall financial condition."[25] In the case before the Tenth Circuit, a debtor had made false oral representations that she owned residences in two cities, a motel, and

---

(i) all of such partnership's property, exclusive of property of the kind specified in subparagraph (A)(i) of this paragraph; and

(ii) the sum of the excess of the value of each general partner's nonpartnership property, exclusive of property of the kind specified in subparagraph (A) of this paragraph, over such partner's nonpartnership debts; and

(C) with reference to a municipality, financial condition such that the municipality is—

(i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or

(ii) unable to pay its debts as they become due.

[21] *Id.*

[22] *Id.* § 101(32)(A) and (B).

[23] *Id.* § 101(32)(C).

[24] *Cadwell v. Joelson (In re Joelson)*, 427 F.3d 700, 706-07 (10th Cir. 2005).

[25] *Id.* at 707.

antique vehicles in order to obtain a loan from an acquaintance.[26] She had also represented that she intended to and would obtain financing from her brother to repay the loan.[27] The Tenth Circuit held that none of the debtor's statements pertained to her "overall financial health" and that they were not statements "respecting" her "financial condition" within the meaning of § 523(a)(2)(A).[28] The Tenth Circuit reasoned that statements within the meaning of that section "are those that purport to present a picture of the debtor's overall financial health."[29] We agree.

We recognize, as did the Tenth Circuit, that there is a split among various courts as to the correct interpretation of § 523(a)(2).[30] A number of bankruptcy courts have reached conflicting conclusions as to meaning of "a statement respecting the debtor's or insider's financial condition.[31] There are relatively few Circuit Court decisions, but at least one conflicts with the Tenth Circuit's

---

[26] *Id.* at 704.

[27] *Id.* at 714.

[28] *Id.* at 715.

[29] *Id.* at 714; *see also id.*, explaining further the Tenth Circuit's reasoning:

We hold that such false statements are those that purport to present a picture of the debtor's overall financial health. Statements that present a picture of a debtor's overall financial health include those analogous to balance sheets, income statements, statements of changes in overall financial position, or income and debt statements that present the debtor or insider's net worth, overall financial health, or equation of assets and liabilities. However, such statements need not carry the formality of a balance sheet, income statement, statement of changes in financial position, or income and debt statement. What is important is not the formality of the statement, but the information contained within it—information as to the debtor's or insider's overall net worth or overall income flow.

[30] *Id.* at 710.

[31] *See Schneiderman v. Bogdanovich (In re Bogdanovich)*, 292 F.3d 104, 112-13 (2d Cir. 2002) (collecting cases).

construction of § 523(a)(2). The Fourth Circuit has held that a debtor's false representation that certain property he owned was unencumbered at the time he pledged it as collateral for a loan from the creditor was a statement regarding the debtor's financial condition and therefore dischargeable.[32]

The Eighth Circuit has construed § 523(a)(2)(A) in a way that is consistent with our and the Tenth Circuit's construction of that provision.[33] A debtor had represented that future payments for the balance of the purchase price for limited partnership interests would be funded from a joint venture interest in a particular nursing home.[34] The debtor did not disclose that at the time these representations were made, the nursing home had been sold.[35] The court rejected the debtor's argument that the failure to disclose was "a statement respecting the debtor's or an insider's financial condition" and held that the debt was not discharged.[36]

The Bandis cite our court's en banc decision in *AT&T Universal Card Services v. Mercer (In re Mercer)*.[37] They correctly acknowledge that this decision does not resolve the issues presented by their appeal. The primary questions before our court in *Mercer* were "whether credit card use (card use) constitutes a representation of intent to pay the loan thereby obtained (intent to pay); and, if so, whether the issuer may justifiably rely on it."[38] We set forth the elements

---

[32] *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060, 1060-61 (4th Cir. 1984).

[33] *See Rose v. Lauer (In re Lauer)*, 371 F.3d 406, 413 (8th Cir. 2004).

[34] *Id.* at 409.

[35] *Id.*

[36] *Id.* at 413.

[37] 246 F.3d 391 (5th Cir. 2001) (en banc).

[38] *Id.* at 399 (emphasis omitted).

that a creditor must prove to establish non-dischargeability for debt incurred as a result of credit card use.[39] We did not hold in that case that each credit card use was a representation of the ability to repay the creditor for the extension of credit, although we did discuss certain cases from other jurisdictions that had held credit card use "represented both *intent and ability* to pay."[40] We noted that "[t]he 'ability' factor has been criticized."[41] We also employed the term "financial condition" in that case and indicated that we thought it meant the overall financial condition of the debtor. We said, for example, "the debtor's financial condition at card-use is only one of many factors to consider, and should not be the sole basis for finding fraudulent intent."[42] We then discussed whether the fact of "hopeless insolvency" could be used, standing alone, to establish fraudulent intent at the time of credit card use, concluding that it could not.[43] We held that "the inquiry focus[es] on the debtor's subjective intent, with such 'hopeless insolvency' simply being 'evidence from which his lack of honest belief *may* be inferred.'"[44] We had no occasion to, and did not, decide in *Mercer* whether representations regarding specific assets were "statement[s] respecting the debtor's or an insider's financial condition" as used in § 523(a)(2)(A).

---

[39] *Id.* at 403 ("for each card-use, and by a preponderance of the evidence," the creditor is "required to prove: (1) [the debtor] made a representation; (2) it was knowingly false; (3) it was made with the intent to deceive [the creditor]; (4) [the creditor] actually *and* justifiably relied on it; and (5) [the creditor] sustained a loss as a proximate result of its reliance.").

[40] *Id.* at 404.

[41] *Id.*

[42] *Id.* at 408 (emphasis omitted).

[43] *Id.* at 409.

[44] *Id.* (quoting the RESTATEMENT (SECOND) OF TORTS § 526 cmt. d) (emphasis omitted).

### III

The bankruptcy court found implicitly if not explicitly that the misrepresentations made by the Bandis regarding ownership of a commercial building, a condominium development, and a residence were intended to convey the impression that the two brothers owned valuable real property and that their personal guarantees of a loan to RSB would be backed by some measure of wealth. These statements fell far short, however, of representing the Bandis' respective net worths or representing their respective "bank balance[s]."[45] The Bandis did not make any representations regarding their overall financial condition and consequent ability to pay. Ownership of specific assets does not mean that the assets are unencumbered or that other debts or liabilities of the owner do not exceed the value of the assets.

The Bandis' false statements and misrepresentations were not "statement[s] respecting [their] financial condition within the meaning of 11 U.S.C. § 523(a)(2)(A).

### IV

The Bandis contend that the bankruptcy court erred in finding that their alleged representations were false and in finding justifiable reliance by Becnel. We review findings of fact for clear error,[46] and there was no clear error based on the record before us.

Becnel and Stephen Bandi had a close personal relationship. When they were initially introduced, and thereafter as their friendship strengthened, Stephen Bandi told Becnel that there were re-building and development opportunities in the New Orleans area following Hurricane Katrina. Becnel

---

[45] *Field v. Mans*, 516 U.S. 59, 76 (1995).

[46] *Valley Educ. Found. v. Eldercare Props. Ltd. (In re Eldercare Props. Ltd.)*, 568 F.3d 506, 515 (5th Cir. 2009) (citing *Nesco Acceptance Corp. v. Jay (In re Jay)*, 432 F.3d 323, 325 (5th Cir. 2005)).

13

expressed interest in pursuing an investment with Stephen Bandi, and over time, as opportunities were discussed, Stephen Bandi represented that he had purchased a residence on Camp Street that he intended to restore for use as a residence and from which his wife's cookie business would be operated. Many representations regarding this residence were made to Becnel and his wife before Becnel agreed to invest in Stephen Bandi's ventures. Stephen Bandi made other detailed representations regarding his plans for renovating and developing a condominium project, and Becnel testified that he relied on Stephen Bandi's representations about his real estate holdings. There was evidence that neither of the Bandi brothers owned the residence on Camp Street or the condominium project, and the Bandis introduced no evidence that they did.

The evidence regarding representations by Charles Bandi is not as extensive as that regarding his brother, but we cannot say that the bankruptcy court clearly erred in finding that Charles Bandi made false representations on which Becnel relied. On the day that the promissory note was executed, Becnel and his wife, who was also Becnel's attorney in this transaction, met Stephen and Charles Bandi at a commercial building that Charles Bandi said he and his brother had just purchased. At the signing of the note, Becnel gave the Bandis two checks to fund the loan, one of which was post-dated three days after the date of this meeting and the other of which was post-dated six days after the meeting. At that meeting, Charles Bandi gave the Becnels a "tour" of the commercial building, representing that he and his brother owned it and had just moved their offices into it. As of the date of these representations by Charles Bandi, Becnel had not funded the loan because the checks he delivered were not

yet negotiable. This is some evidence to support the findings that Charles Bandi made false representations on which Becnel justifiably relied.[47]

The evidence is weakest with respect to whether the Bandis had intent to deceive. During closing argument, Stephen Bandi argued that he never intended for Becnel to rely on the status of his properties and that he never intended to deceive Becnel or his wife. As the bankruptcy court noted, however, the Bandis did not present any evidence to counter Becnel's proof, and the bankruptcy court noted that the result might have been different if the Bandis had testified or offered any other evidence. However, they did not, and the bankruptcy court did not clearly err.

V

The Bandis argue that the bankruptcy court changed its construction of "a statement respecting the debtor's . . . financial condition" over the course of the adversary proceedings. The Bandis contend that they were under the impression throughout trial that the bankruptcy court had adopted an interpretation of § 523(a)(2)(A) under which their representations did pertain to their "financial condition," and that they therefore had prevailed as a matter of law because almost all of the statements at issue would be statements respecting financial condition. They argue that they would have defended themselves differently if they had known the bankruptcy court ultimately would adopt a different view.

Although the bankruptcy court's statements at hearings on pretrial motions are at times confusing, it is clear that the bankruptcy court never definitively ruled before trial on the proper interpretation of "a statement respecting the debtor's . . . financial condition." It appears as if Stephen Bandi, who is not an attorney, was making inartful attempts to raise the issue both

---

[47] *See Field v. Mans*, 516 U.S. 59, 73-74 (1995).

15

before trial and during closing arguments. However, he did not cite any cases or make any arguments as to why the statements at issue were statements respecting "financial condition" until a post-trial motion. The bankruptcy court never specifically ruled on the issue until its ruling on the post-trial motion. Furthermore, it is unclear why the Bandis thought they had won as a matter of law, thus prejudicing their defense, when none of Becnel's claims had been dismissed and all had proceeded to trial.

\* \* \*

For the foregoing reasons, the judgment of the district court affirming the judgment of the bankruptcy court is AFFIRMED.